**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 04-2070 (GK)** |
| ) | |
| **AMERICAN INTERNATIONAL GROUP, INC.**, ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

This civil action brought by the Securities and Exchange Commission ("SEC") against the American International Group ("AIG") under the Securities Act of 1933, 15 U.S.C. § 77a et seq., the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and Rules promulgated pursuant to the Securities Exchange Act, is now before the Court on Sue Reisinger's Motion for Leave to Intervene for Access to Monitor's Reports ("Reisinger Mot.") [Dkt. No. 18]. Upon consideration of the Motions, Opposition, Reply, and the entire record herein, and for the reasons stated below, Reisinger's Motion is **granted.**

## I. Background

On November 30, 2004, the SEC filed a Complaint against AIG, alleging violations of federal securities laws [Dkt. No. 1]. On the same date, the SEC submitted to the Court the Consent of Defendant American International Group, Inc. ("Consent Order") [Dkt. No.

1-1]. In this document, AIG consented to entry of Final Judgment without admitting or denying the allegations of the Complaint. The Court entered Final Judgment, incorporating the Consent Order, on December 7, 2004 [Dkt. No. 2].

Under the terms of the Consent Order, AIG agreed to take on two main responsibilities. First, AIG consented to establish a Transaction Review Committee to review transactions taking place after the entry of Final Judgment. The Committee was charged with setting up procedures to identify transactions that would involve heightened legal, reputational, or regulatory risk. Under the Consent Order, these transactions require review and approval by the Committee before they can be completed.

Second, AIG agreed to retain an independent consultant, selected by the Fraud Section of the Department of Justice and acceptable to the SEC, to review the Transaction Review Committee's policies and procedures as well as all transactions that AIG entered into between January 1, 2000, and the date of the Final Judgment and that had "a primary purpose of enabling a Reporting Company to obtain an accounting or financial reporting result." Consent Order ¶ 3.a.1. The purpose of the review of past transactions was for the Independent Consultant to determine whether they were used or designed to permit counter-parties to violate generally accepted accounting principles ("GAAP") or rules

promulgated by the SEC. These transactions formed the basis of the SEC's Complaint.

At the conclusion of his or her review, the consultant was required to provide copies of reports of his or her findings ("IC Reports") to the SEC, the DOJ, and AIG's Audit Committee. AIG was then required to implement all reasonable recommendations made by the consultant. If AIG violated certain designated provisions of the Consent Order, the SEC was permitted to petition the Court to vacate the Final Judgment and restore the action to its active docket, i.e., to proceed with litigating the Complaint. Further, the Court retained jurisdiction over the case in order to enforce all terms of the Final Judgment, including provisions related to the IC Reports.

More than a year and half later, on June 14, 2006, the SEC and AIG filed a Joint Motion for Clarification of Consent of American International Group, Inc. ("Joint Mot. for Clarification") [Dkt. No. 3]. According to this Joint Motion, "[i]t was not the parties' intent that [the information provided by AIG to the independent consultant] be disseminated or available to anyone outside of the entities identified in the Consent." Joint Mot. for Clarification 3. Accordingly, the SEC and AIG requested that the Court "clarify" the Consent Order by adding a provision prohibiting public dissemination of the IC Reports.

The Court granted the Joint Motion for Clarification on June 14, 2006 [Dkt. No. 4]. Since that time, the Court has twice granted requests to release IC Reports: once on October 23, 2007, to the Office of Thrift Supervision at the request of the SEC and AIG [Dkt. No. 8], and once on May 4, 2009, to the House of Representatives Committee on Oversight and Government Reform at the request of the SEC [see Dkt. No. 11].

According to Reisinger's Motion, she filed a Freedom of Information Act request with DOJ on January 6, 2011, requesting disclosure of the IC Reports. Reisenger Mot. 5. The DOJ told her that they could not find the IC Reports, but that they had also been filed with the SEC. Id. On March 9, 2011, Reisinger filed a FOIA request with the SEC. Id. On April 21, 2011, the SEC denied the request, citing this Court's June 14, 2006 Order restricting dissemination of the IC Reports. Id.

On April 29, 2011, Reisinger sent the Court a letter requesting release of the IC Reports [Dkt. No. 12-1]. On May 4, 2011, the Court posted the letter on the docket and ordered the parties to file responses [Dkt. No. 12]. On June 6, 2011, upon consideration of the responses, the Court notified all relevant parties that any request to unseal and release the IC Reports must be made by formal motion [Dkt. No. 17].

On February 7, 2012, Reisinger filed her Motion to Intervene for Access to Monitor's Reports. On February 28, 2012, the SEC and

AIG filed a Joint Opposition ("Joint Opp'n") [Dkt. No. 20]. On March 16, 2012, Reisinger filed a Reply [Dkt. No. 22].

## II.  Analysis

Reisinger argues that the Court should order the SEC to make the IC Reports publicly available on two grounds: (1) a First Amendment right of access to judicial proceedings and (2) a common law right of access to judicial records. Reisinger Mot. 5. Each argument will be addressed in turn.

### A.    First Amendment Right of Access

In Richmond Newspapers, Inc. v. Virginia, the Supreme Court held that "the right to attend criminal trials is implicit in the guarantees of the First Amendment." 448 U.S. 555, 580 (1980). The Supreme Court fleshed out this right in Press-Enterprise Co. v. Superior Court, 478 U.S. 1 (1986). In that case, the court held that a qualified First Amendment right of public access attaches to criminal proceedings and related materials where (1) "the place and process have historically been open to the press and general public" and (2) "public access plays a significant positive role in the functioning of the particular process in question." Id. at 8.

Once a presumptive right attaches, "the proceedings cannot be closed unless specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Id. at 13-14 (internal quotations omitted). Reisinger argues that the IC Reports

-5-

are analogous to documents supporting a plea agreement in a criminal trial and are therefore entitled to a presumption of access under the First Amendment. Reisinger Mot. 6-7.

The limits of this First Amendment right of access are clear in this Circuit. As the Court of Appeals has stated, "neither this Court nor the Supreme Court has ever <u>indicated</u> that it would apply the <u>Richmond Newspapers</u> test to anything other than criminal judicial proceedings." <u>Ctr. for Nat'l Sec. Studies v. DOJ</u>, 331 F.3d 918, 935 (D.C. Cir. 2003) (emphasis in original); <u>accord</u> <u>Flynt v. Rumsfeld</u>, 355 F.3d 697, 704 (D.C. Cir. 2004). The SEC brought a civil, not criminal, action against AIG.

Moreover, even if the First Amendment right of access were to be extended to proceedings in civil actions, as other circuits have done, Reisinger has not even attempted to make the requisite showing that "such access has historically been available." <u>Washington Post v. Robinson</u>, 935 F.2d 282, 288 (D.C. Cir. 1991); <u>Press-Enterprise</u>, 478 U.S. at 8. Because "it is impossible to say that access to such a document has historically been available . . . intervenor['s] claim fails to satisfy the first of the two necessary criteria for a First Amendment right of access." <u>United States v. El-Sayegh</u>, 131 F.3d 158, 161 (D.C. Cir. 1997). Therefore, there is no First Amendment right of access to the IC Reports.

### B.    Common Law Right of Access

Reisinger also argues that the IC Reports should be publicly available under the common law right of access to judicial records.[1] As courts are quick to observe, "[t]he common law right of access to judicial records antedates the Constitution." El-Sayegh, 131 F.3d at 161 (citing Leucadia, Inc. v. Applied Extrusion Techs., Inc., 998 F.2d 157, 161 (3d Cir. 1993)). This right of access reflects "the citizen's desire to keep a watchful eye on the workings of public agencies." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978); El-Sayegh, 131 F.3d at 161. "The presumption of access is based on the need for federal courts, although independent--indeed, particularly because they are independent--to have a measure of accountability and for the public to have confidence in the administration of justice." United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995) ("Amodeo II"); see also El-Sayegh, 131 F.3d at 162-63.

In order to determine whether a document should be accessible to the public, a court must proceed in two steps. First, the court must determine whether the document is a judicial record. El-Sayegh, 131 F.3d at 162-63; Washington Legal Found. v. U.S. Sentencing Comm'n, 89 F.3d 897, 902 (D.C. Cir. 1996). Second, the

---

[1] Reisinger alternatively contends that the common law right of access should extend to the IC Reports on the theory that they are public records. Reisinger Mot. 10-11. It is not necessary to reach this question, since, as explained below, the IC Reports are disclosable as judicial records.

court must balance the competing interests in publicity and in secrecy. <u>Nixon</u>, 435 U.S. at 602; <u>Washington Legal Found.</u>, 89 F.3d at 902.

### 1. Judicial Records

Our Court of Appeals defined the contours of judicial records in <u>El-Sayegh</u>. In this circuit, "what makes a document a judicial record and subjects it to the common law right of access is the role it plays in the adjudicatory process." <u>El-Sayegh</u>, 131 F.3d at 163. According to this standard, a document must relate to a judicial decision bearing on the litigants' substantive rights to constitute a judicial record. <u>Id.</u> at 162. Hence, a repudiated plea agreement in a case where the indictment has been dismissed--i.e., where there is nothing further for the court to do--is not a judicial record, <u>id.</u> at 163, but an exhibit submitted in support of a motion for summary judgment--i.e., where the court has to decide the motion--is. <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 121 (2d Cir. 2006).

For the following reasons, the Court concludes that the IC Reports are relevant to the judicial function and therefore are properly considered judicial records. <u>El-Sayegh</u>, 131 F.3d at 163; <u>Lugosch</u>, 435 F.3d at 119. First, the IC Reports themselves may well give rise to a substantive judicial decision in this case. <u>See</u> <u>Lugosch</u>, 435 F.3d at 121-22 (documents that may be relied upon in deciding a motion for summary judgment constitute judicial

-8-

records). The Reports may provide information leading the SEC to return to this Court to secure further relief. In other words, the Consent Order empowers the Court to retain jurisdiction for the purposes of enforcing the Consent Order, including compliance with the IC Reports. Consent Order ¶ 14.

In this sense, this case is analogous to United States v. Amodeo. 44 F.3d 141 (2d Cir. 1995) ("Amodeo I"). There, the Court of Appeals for the Second Circuit held that reports generated pursuant to a consent decree by an independent court officer, which the officer did not intend to make public, were judicial records subject to a common law right of access because the consent decree made the reports "relevant to the performance of the judicial function and useful in the judicial process." Id. at 146. Specifically, the consent decree permitted the officer "to apply for necessary and appropriate assistance to execute her powers, and the progress report certainly would be germane in assessing such an application." Id. Additionally, the consent decree allowed "any party to seek enforcement of, or relief from, any of the provisions of the Decree," and empowered the court "to grant relief 'consider[ing] the record of all proceedings . . . to the date of the application.'" Id. (quoting consent decree).

Just as the officer in Amodeo I could apply to the court for assistance in executing her powers, so too the SEC may apply to this Court to enforce the provisions of the Consent Order. Just as

the officer's reports in <u>Amodeo I</u> could prove useful to that court's evaluation of compliance with the consent decree, so too the IC Reports may prove critical to this Court's assessment of conformity to the Consent Order.

The SEC and AIG attempt to distinguish <u>Amodeo I</u> on the ground that "[t]he IC here is in no way analogous to a 'Court Officer' with court appointed Receiver powers." Joint Opp'n 8. However, neither the holding of <u>Amodeo I</u> nor any other case that the SEC and AIG have pointed to suggests that the powers of the author of the document in question have any bearing on whether that document is a judicial record. The sole question, as explained above, is whether the document is relevant to the adjudicatory process. <u>El-Sayegh</u>, 131 F.3d at 163; <u>Amodeo I</u>, 44 F.3d at 146.

Second, the central role the IC Reports play in the operation of the Consent Order makes them precisely the kind of documents that must be open to the public in order for the federal courts "to have a measure of accountability and for the public to have confidence in the administration of justice." <u>Amodeo I</u>, 71 F.3d at 1048; <u>see also</u> <u>Nixon</u>, 435 U.S. at 598; <u>El-Sayegh</u>, 131 F.3d at 162-63. As explained above, the Final Judgment and Consent Order replaced a full adjudication on the merits in this case. Though filed after, rather than before, the Consent Order itself, the IC Reports are an integral part of the Consent Order because they are intended to document and ensure AIG's compliance with the IC's

investigation and final recommendations. Such compliance is central to the effectiveness of the Consent Order. Indeed, for this very reason, the Court retains jurisdiction to enforce AIG's adherence to the Consent Order's terms. Consent Order ¶ 14.

Therefore, the IC Reports are not just relevant to a future adjudicatory function, but are necessary to ensure public accountability for the actual adjudication of this case--namely, the approval of the original Consent Order. Nixon, 435 U.S. at 598; El-Sayegh, 131 F.3d at 162-63; Amodeo I, 71 F.3d at 1048. In this sense, the IC Reports are no different than executed plea agreements with their statements of facts to which the defendant pleads and motions for summary judgment with their many attached exhibits, both of which substitute for a full adjudication of the litigants' rights on the merits, and both of which are presumptively available to the public. Robinson, 935 F.2d at 292; Lugosch, 435 F.3d at 121.

In sum, the IC Reports are relevant to both the potential compliance adjudication contemplated by the Consent Order and the original Final Judgment in this matter. Hence, the IC Reports are judicial records. El-Sayegh, 131 F.3d at 163.

### 2. Balancing

"At this point, [the Court is] faced with the task of weighing the interests advanced by the parties in light of the public interests and the duty of the courts." Nixon, 435 U.S. at 602; see

also <u>Washington Legal Found.</u>, 89 F.3d at 902 ("the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure"). The decision to grant access to judicial records is left to the trial judge's discretion, "to be exercised in light of the relevant facts and circumstances of the particular case." <u>Nixon</u>, 435 U.S. at 599; <u>accord</u> <u>El-Sayegh</u>, 131 F.3d at 160.

The SEC and AIG advance two interests that they contend urge non-disclosure. First, the SEC and AIG argue that "[b]oth the Commission and AIG expected at the signing of the Consent that the information provided to the IC, and the IC Reports, would remain confidential." Joint Opp'n 12-13. Therefore, they argue, the Reports should remain confidential in order to protect this expectation as well as the SEC's ability to enter into similar agreements in the future. <u>Id.</u>

The SEC and AIG's position is belied by a simple fact: it took over a year and half after entry of the Final Judgment and Consent Order--which included no confidentiality provision--for the SEC and AIG to return to this Court and request modification of the Consent Order to prevent disclosure of the IC Reports. It is true, as the SEC and AIG point out, that their June 2006 Joint Motion for Clarification states that "[i]t was not the parties' intent that this information be disseminated or available to anyone outside of the entities identified in the Consent." Joint Mot. for

Clarification 3. But it is hard to believe that confidentiality was very significant to the parties at the time the Consent Order was signed, if such an important provision was forgotten or overlooked by all the high powered and highly paid attorneys on both sides.

Whatever the parties may have said they intended, with the benefit of hindsight, when jointly requesting the confidentiality provision, the original Consent Order does not demonstrate that it was predicated on confidentiality. In light of this fact, the SEC and AIG's argument that cooperation between the SEC and future defendants will be jeopardized by the release of the IC Reports rings hollow.

Second, "AIG believes that disclosure of the IC Reports here would cause competitive commercial harm to AIG and to the customers whose transactions were reviewed by the IC." Joint Opp'n 13. Reisinger has already offered a compromise to answer this concern: the IC Reports can be redacted. Reisinger Mot. 12-15. Limited redactions to withhold proprietary information that would be valuable to AIG's competitors--exactly the information the Joint Motion for Clarification purported to protect--would allay fears that AIG's position would be negatively affected while advancing the public's interest in disclosure.

As to the public's interest in favor of disclosure of the IC Reports, it is overwhelming. First, as Reisinger states, "access to the Independent Consultant Reports will allow the public to

evaluate the contents and see that the consent agreement process is legitimate and fair." Reisinger Mot. 14. Second, and most important of all, given the financial meltdown of 2008, the recession it spawned, and the suffering the country has endured because of it, and given the role that AIG played in that financial meltdown, the public needs to know whether the obligations AIG undertook in the Consent Order were complied with, whether the SEC was carrying out its enforcement and monitoring responsibilities under the Consent Order, and what, if any, role the compliance--or noncompliance-- with the Consent Order may have played in the devastating events of 2008.

For these reasons, there is no question that the public interest far outweighs AIG's or the SEC's interest in confidentiality, especially given the availability of redaction.

## III. Conclusion

For the reasons set forth above, Sue Reisinger's Motion for Leave to Intervene for Access to Monitor's Reports is **granted**, and the parties must make the redacted IC Reports available to the public.

An Order will issue with this opinion.


April 16, 2012                    /s/_____
                                  Gladys Kessler
                                  United States District Judge

**Copies via ECF to all counsel of record**

-14-